U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

2010 NOV -2  AM 9: 29

CLERK
BY _____ [signature]
DEPUTY CLERK

|  |  |
|---|---|
| **RUSSELL BLANK, Individually and** ) | |
| **On Behalf of All Others Similarly** ) | |
| **Situated,** ) | **CIVIL ACTION NO.** $2:10 \cdot cv \cdot 267$ |
|  ) | |
| **Plaintiff,** ) | |
|  ) | **CLASS ACTION COMPLAINT** |
| **vs.** ) | **FOR VIOLATIONS OF** |
|  ) | **FEDERAL SECURITIES LAWS** |
| **GREEN MOUNTAIN COFFEE** ) | |
| **ROASTERS, INC., LAWRENCE J.** ) | |
| **BLANFORD and FRANCES G. RATHKE,** ) | |
|  ) | **JURY TRIAL DEMANDED** |
| **Defendants** ) | |

## INTRODUCTION

Plaintiff Russell Blank, by and through his attorneys, alleges the following upon personal

knowledge as to himself and upon information and belief as to other matters, based upon the

investigation of counsel. The investigation of counsel is based upon, among other things, a

review of public filings made by Green Mountain Coffee Roasters, Inc. ("Green Mountain" or

the "Company") with the United States Securities and Exchange Commission ("SEC"), press

releases issued by the Company, media reports about the Company and publicly available trading

data relating to the price and volume of Green Mountain securities.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of the common

stock of Green Mountain between July 28, 2010 and September 28, 2010, inclusive (the "Class

Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange

Act").

2.      Green Mountain is a leader in the specialty coffee and coffee maker businesses. It sells over 200 whole bean and ground coffee selections, cocoa and teas in the United States and abroad.

3.      On September 28, 2010, in a Form 8-K filed with the SEC, the Company disclosed that on September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that "it was conducting an inquiry and made a request for a voluntary production of documents and information." The Company went on to state that "[b]ased on the request, the Company believes the focus of the inquiry concerns certain revenue recognition practices and the Company's relationship with one of its fulfillment vendors."

4.      In response to this announcement, shares of the Company's stock fell $5.95 per share, or 16%, to close at $31.06 per share on September 29, 2010, on about ten times the average trading volume.

5.      Throughout the Class Period, defendants made materially false and misleading statements, causing the Company's stock to trade at artificially inflated prices.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

7.      This Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the false and misleading statements giving rise to the violations of law were made in or issued from this District. In addition, defendant Green Mountain maintains its executive offices within this Judicial District. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities

2

of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.     Plaintiff Russell Blank, as set forth in the accompanying certification, purchased the common stock of Green Mountain at artificially inflated prices during the Class Period and has been damaged thereby.

10.     Defendant Green Mountain, founded in 1981, is a corporation organized under the laws of the state of Delaware and maintains its principal place of business at 33 Coffee Lane, Waterbury, Vermont 05676. The Company operates in the specialty coffee industry both in the United States and internationally.  Green Mountain markets coffee, tea, cocoa, and single-cup brewers to retailers, such as department stores and club stores, and single-cup brewers to distributors, as well as to supermarkets. The Company manages its operations through two business segments, the Specialty Coffee Business Unit ("SCBU"), formerly referred to as Green Mountain Coffee ("GMC"), and the Keurig Business Unit ("Keurig"). In recent years, K-Cups and Keurig brewing systems have become a significant driver of the Company's growth.

11.     Defendant Lawrence Blanford ("Blanford") is, and during the Class Period was, Chief Executive Officer and President of the Company. During the Class Period, defendant Blanford signed and certified the Company's Form 10-Q.

12.     Defendant Frances G. Rathke ("Rathke") is, and during the Class Period was, Chief Financial Officer, Treasurer and Vice President of the Company. During the Class Period, defendant Rathke certified the Company's Form 10-Q.

13.     The Defendants referenced above in ¶¶ 11-12 are referred to herein as the "Individual Defendants."

14.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Green Mountain's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were then materially false and misleading. Accordingly, the Individual Defendants are liable for the false and misleading statements pleaded herein.

15.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Green Mountain common stock by disseminating materially false and misleading statements and/or concealing material adverse facts by: (a) deceiving the investing public regarding Green Mountain's business, operations, management, and the intrinsic value of Green Mountain common stock; (b) enabling defendants to artificially inflate the price of Green Mountain shares; (c) enabling Green Mountain to sell $250 million of Company shares to Luigi Lavazza S.p.A. ("Lavazza"), while defendants were in possession of material, adverse, non-public information about the Company; (d) enabling Green Mountain insiders to sell millions of dollars of their privately held Green Mountain shares while in possession of material, adverse, non-public information about the Company; and (e) causing plaintiff and other members of the Class to purchase Green Mountain common stock at artificially inflated prices.

4

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired the common stock of Green Mountain between July 28, 2010 and September 28, 2010, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

      (a)     Whether defendants' conduct violated the federal securities laws;

      (b)     Whether defendants omitted and/or misrepresented material facts;

      (e)     Whether defendants acted with scienter;

      (d)     Whether defendants engaged in perpetrating a manipulative and deceptive device and/or scheme, and/or otherwise engaged in a fraudulent course of conduct;

      (e)     Whether the market prices of Green Mountain's common stock were artificially inflated; and

      (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

18.     Plaintiff's claims are typical of those of the Class because plaintiff and the other members of the Class sustained damages as a result defendants' wrongful conduct complained of

herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no

interests that conflict with those of the Class.

20.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  Furthermore, as the damages suffered by individual Class

members may be relatively small, the expense and burden of individual litigation make it

virtually impossible for Class members individually to seek redress for the wrongful conduct

alleged herein.  There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Materially False and Misleading
### Statements Made During the Class Period

21.     The Class Period begins on July 28, 2010, with the Company's issuance of a press

release entitled "Green Mountain Coffee Roasters, Inc. Reports Continued Strong Sales and

Earnings Growth For the Fiscal 2010 Third Quarter."  The press release sated, in part:

> 64% Net Sales Growth Driven by Success of Keurig® Single-Cup Brewing
> System; Q3 2010 GAAP EPS of $0.13 and Non-GAAP EPS of $0.19; Company
> Provides Initial Outlook For Fiscal 2011
>
> WATERBURY . VT (July 28, 2010) — Green Mountain Coffee Roasters, Inc.,
> (NASDAQ: GMCR) today announced its fiscal 2010 third quarter results for the
> thirteen weeks ended June 26, 2010.
>
> Net sales for the third quarter of fiscal 2010 increased 64% to $311.5 million as
> compared to $190.5 million reported in the third quarter of fiscal 2009. According
> to Generally Accepted Accounting Principles ("GAAP"), net income for the third
> quarter of fiscal 2010 totaled $18.6 million, or $0.13 per fully diluted share.
>
> Excluding transaction-related expenses incurred in the quarter, and the resulting
> tax effect of reversing the tax benefit associated with previously incurred
> acquisition related expenses, the Company's non-GAAP net income for the third
> quarter of fiscal 2010 was $25.8 million, or $0.19 per diluted share, representing
> an increase of 82% from $14.1 million, or $0.12 per diluted share, in the third

quarter of fiscal 2009.

22.    Regarding the Company's purported costs, margins and income, the July 28, 2010

press release stated, in part:

> Third quarter 2010 gross profit increased to 35.2% of total net sales compared to
> 33.6% for the corresponding quarter in 2009. This was as a result of higher
> manufacturing gross margin derived from the increase in volume of the
> Company's manufactured K-Cups as a percentage of total system volume.
>
> During the third quarter, the Company experienced continued higher levels of
> warranty expense and sales returns related to a quality issue associated with
> certain brewer models produced primarily in late calendar 2009. As previously
> disclosed, the Company implemented hardware and software changes which it
> believes has corrected the issue. The Company reached agreement with its
> suppliers and will recover approximately $6 million as reimbursement related to
> this issue. This recovery was reflected in the third quarter cost of sales as a
> reduction to warranty expense and substantially offsets the higher warranty
> expense and sales returns costs incurred in the fiscal third quarter.
>
> Selling, general and administrative expenses as a percentage of net sales for the
> third quarter were 23.0% as compared to 21.7% in the prior year. Third quarter
> 2010 general and administrative expenses include $4.0 million related to the
> Diedrich acquisition as well as the amortization of identifiable intangibles of $4.3
> million due to the Company's prior acquisitions as compared to $1.5 million in
> the prior year third quarter.
>
> The Company increased its GAAP operating income by 68%, to $38.2 million, in
> the third quarter of fiscal 2010, as compared to $22.8 million in the year ago
> quarter, and improved its GAAP operating margin to 12.3% from 12.0% in the
> prior year period. Excluding the impact of the $4.0 million transaction-related
> expenses in the third quarter of fiscal 2010, the Company's non-GAAP operating
> income was up 85% to $42.2 million and represented 13.5% of sales compared to
> $22.8 million, or 12.0% of sales in the prior year.
>
> Interest expense was $1.5 million in the third quarter of fiscal 2010, compared to
> $1.1 million in the prior year quarter.
>
> Income before taxes for the third quarter of fiscal 2010 increased 70% to $36.7
> million as compared to $21.7 million in the third quarter of fiscal 2009.
>
> The Company's tax rate for the fiscal third quarter was 49.5% as compared to
> 34.7% in the prior year quarter reflecting the tax effect of the recognition of the
> estimated total $12 million non-deductible acquisition-related expenses incurred
> during the Company's first, second and third quarters of fiscal 2010 for the
> Diedrich acquisition which closed during the Company's fiscal third quarter.

7

23.    The July 28, 2010 release also quoted defendant Blanford, in part:

> In our fiscal third quarter, through the strong efforts of all our employees, we delivered excellent results on our key financial performance metrics including revenue, gross margin, operating margin and net income. We have now achieved 11 consecutive quarters of better than 40 percent net sales growth. For the first nine months of fiscal 2010 we have produced net sales growth of 70% and non-GAAP earnings per share growth of 89% over the same period for fiscal year 2009.
>
> Continued execution of our strategic business initiatives, including most recently, our acquisition of Diedrich, is driving GMCR's growth and enabling us to advance adoption and awareness of our growing portfolio of compelling brands"
>
> We believe the inherent strength of our business model, combined with our passionate employees, the strong support of our business partners and our fervent belief that we can transform the way the world views business are key drivers behind our growth and success.  Blanford continued: "The coming holiday buying season is shaping up to be another exciting opportunity for us to help more consumers discover and enjoy outstanding beverages with the convenience and choice of the Keurig Single-Cup brewing system. We are looking for a strong kickoff to our fiscal year 2011 and are providing our initial fiscal year 2011 estimate for sales growth in a range of between 44% to 50% and earnings per share of $1.15 to $1.20."

24.    The July 28, 2010 release also provided purported forward guidance, in part, as

follows:

> Business Outlook and Other Forward-Looking Information
>
> Fourth Quarter and Fiscal Year 2010
>
> With one quarter remaining, the Company has refined its outlook for its fiscal year 2010 and is providing its first estimates for its fourth quarter of fiscal 2010. It now expects:
>
> Total fiscal fourth quarter consolidated net sales growth of 58% to 63% resulting in total fiscal 2010 consolidated net sales growth of 66% to 68%, compared to the prior estimate of 62% to 65%.
>
> Total fiscal 2010 K-Cup portion packs shipped system-wide by all Keurig licensed roasters to increase in the range of 73% to 76%, compared to prior estimate of 73% to 78%.
>
> Fiscal fourth quarter non-GAAP operating margin in the range of 13.0% to 13.5%, resulting in a total fiscal 2010 non-GAAP operating margin in the range of

8

12.1% to 12.5% excluding acquisition-related transaction expenses.

Fiscal 2010 interest expense of $5.5 million to $6.5 million.

A tax rate of 39.2% for the fiscal year excluding the tax impact of expenses related to the Timothy's and Diedrich acquisitions.

Fiscal fourth quarter fully diluted non-GAAP earnings per share in the range of $0.18 to $0.20 per share, resulting in total fiscal 2010 fully diluted non-GAAP earnings per share in the range of $0.69 to $0.71 per share, excluding any acquisition-related transaction expenses. The fully diluted non-GAAP earnings per share estimate of $0.69 to $0.71 for the 2010 fiscal year includes $15 million pre-tax or $0.07 per diluted share non-cash amortization expenses related to the identifiable intangibles of the Company's acquisitions.

Capital expenditures for fiscal 2010 in the range of $120 to $140 million, as compared to prior estimates in the range of $105 to $125 million.

Depreciation and amortization expenses in the range of $44 to $46 million for fiscal year 2010, including $15 million for amortization of identifiable intangibles, up from prior estimates of $40 to $44 million.

First Issue of Company Estimates for Fiscal Year 2011

The company also is providing its first estimates for fiscal year 2011: Total consolidated net sales growth of 44% to 50%.

Total K-Cup portion packs shipped system-wide to increase in the range of 64% to 68%.

Fully diluted earnings per share in the range of $1.15 to $1.20 per share, representing an increase in the range of 62% to 74% over fiscal year 2010's fully diluted non-GAAP earnings per share estimate range of $0.69 to $0.71 per share. The fiscal 2011 estimate includes approximately $22 million, or approximately $0.09 per share, of non-cash amortization expenses related to the identifiable intangibles mentioned above.

25.     After the Company's press release, shares of the Company's stock rose

approximately 9% from a close of $28.67 per share on July 28, 2010, to a close of $31.36 per

share the following day, after publication of these results.

26.     On August 5, 2010, defendants filed with the SEC the Company's Form 10-Q, for

the third fiscal quarter ended June 26, 2010. The Form 10-Q was signed and certified by

9

defendants Blanford and Rathke, and reaffirmed the Company's financial results previously

announced on June 28, 2010. Defendants Blanford and Rathke signed the following

certifications:

**CERTIFICATION PURSUANT TO SECURITIES EXCHANGE ACT
RULES 13A-14 AND 15D-14 AS ADOPTED PURSUANT TO SECTION
302 OF THE SARBANES-OXLEY ACT OF 2002**

1.      I have reviewed this quarterly report on Form 10-Q of Green Mountain Coffee
Roasters, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a
material fact or omit to state a material fact necessary to make the statements made, in light of
the circumstances under which  such statements were made, not misleading with respect to the
period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information
included in this report, fairly present in all material respects the financial condition, results of
operations and cash flows of the registrant as of and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)
and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules
13a-15(f) and 15d-15(f) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our supervision, to ensure that material
information relating to the registrant, including its consolidated subsidiaries, is made known to
us by others within those entities, particularly during the period in which this report is being
prepared;

b.      Designed such internal control over financial reporting, or caused such
internal control over financial reporting to be designed under our supervision, to provide
reasonable assurance regarding the reliability of financial reporting and the preparation of
financial statements for external purposes in accordance with generally accepted accounting
principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and
procedures and presented in this report our conclusions about the effectiveness of the disclosure
controls and procedures, as of the end of the period covered by this report based on such
evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over
financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's
fourth fiscal quarter in the case of an annual report) that has materially affected, or is reporting;

and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 5, 2010
/s/ Lawrence J. Blanford
Lawrence J. Blanford
President and Chief Executive Officer

Date: August 5, 2010
/s/ Frances G. Rathke
Frances G. Rathke
Chief Financial Officer

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARRANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Green Mountain Coffee Roasters, Inc. (the "Company") on Fom10-Q for the period ending June 26, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Lawrence J. Blanford, as the Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: August 5, 2010
/s/ Lawrence J. Blanford
Lawrence J. Blanford
President and Chief Executive Officer

11

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Green Mountain Coffee Roasters, Inc. (the "Company") on Form 10-Q for the period ending June 26, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Frances G. Rathke, as the Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: August 5, 2010
/s/ Frances G. Rathke Frances G. Rathke
Chief Financial Officer

27.     The Form 10-Q also provided statements concerning the Company's accounting

policies and the basis of its accounting presentation:

### Basis of presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information, the instructions to Form 10-Q, and Rule 10-01 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete consolidated financial statements.

In the opinion of management, all adjustments considered necessary for a fair presentation of the interim financial data have been included. Results from operations for the thirteen and thirty-nine week periods ended June 26, 2010 are not necessarily indicative of the results that may be expected for the fiscal year ending September 25, 2010.

The September 26, 2009 balance sheet data was derived from audited financial statements but does not include all disclosures required by accounting principles generally accepted in the United States of America. For further information, refer to the consolidated financial statements and the footnotes included in the annual report on Form 10-K for Green Mountain Coffee Roasters, Inc. for the fiscal year ended September 26, 2009. Throughout this presentation, we refer to the consolidated company as the "Company".

> The Company has revised the classification of certain information presented in its
> fiscal 2009 Unaudited Consolidated Balance Sheet to conform to its fiscal 2010
> presentation.

28.     The Company's Form 10-Q also contained representations about the

Company's purported effectiveness and sufficiency of the Company's controls and procedures,

as follows:

> ### Item 4. **Controls and Procedures**
>
> As of June 26, 2010, the Company's management with the participation of its
> Chief Executive Officer and Chief Financial Officer conducted an evaluation of
> the effectiveness of the design and operation of the Company's disclosure
> controls and procedures pursuant to Rule 13a-15 and 15d-15 under the Securities
> Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, our Chief
> Executive Officer and Chief Financial Officer concluded that the Company's
> disclosure controls and procedures (as defined in Rule 13a-15 of the Exchange
> Act) are effective.
>
> There have been no changes in the Company's internal control over financial
> reporting during the most recent fiscal quarter that have materially affected, or are
> reasonably likely to materially affect, the Company's internal control over
> financial reporting.

29.     Then, on August 10, 2010, defendants announced that they had entered into an

agreement to sell approximately $250 million of the Company's stock to Lavazza. The press

release stated, in part:

> GREEN MOUNTAIN COFFEE ROASTERS, INC. ANNOUNCES $250
> MILLION COMMON STOCK PURCHASE AGREEMENT WITH LUIGI
> LAVAZZA S.p.A.
>
> Companies to Work Toward Development, Marketing and Distribution
> Agreement WATERBURY, Vt., and TORINO, Italy, August 10, 2010 -- Green
> Mountain Coffee Roasters, Inc. (GMCR) (NASDAQ: GMCR) and Luigi Lavazza
> S.p.A (Lavazza) announced the companies have entered into a $250 million
> common stock purchase agreement. Under terms of the agreement, Lavazza has
> agreed to purchase $250 million in aggregate purchase price of newly issued
> shares of GMCR's $0.10 par value Common Stock, or approximately 7% of
> GMCR's current outstanding shares, at a price per share equal to the 60 day
> volume weighted average price ("VWAP") at closing minus 7.5%. This
> investment requires approval under the Hart-Scott-Rodino Antitrust
> Improvements Act of 1976 and is expected to close in September 2010.

The common stock purchase agreement provides that Lavazza (1) not sell the purchased shares for a year and then thereafter only in open-market transactions or to certain institutional investors, (2) vote these shares in concert with the Company's Board, (3) may have an observer at the Company's Board meetings and, (4) in the future and under certain circumstances, a right to designate a Board member, In addition, the Agreement contains a 5-and-one-half-year customary standstill period, subject to certain exceptions after a one-year period, including the right to purchase additional shares up to 15% of the Company's outstanding shares.

30.     In the August 10, 2010 press release, defendant Blanford, in relevant part, stated:

Lavazza's investment in GMCR reflects their confidence in our strategy, vision and execution and provides enhanced financial flexibility to fund our growth and future enabling initiatives.

We have developed an effective working relationship with Lavazza and, based on the impressive quality of the Lavazza people and technology, we believe there is strong potential for a commercial alliance between GMCR and Lavazza that will leverage our complementary coffee systems and respective geographic strengths.

31.     The statements made by defendants and contained in the Company's July 28,

2010 press release, the Form 10-Q filed with the SEC on August 5, 2010 and the August 10,

2010 press release were each materially false and misleading when made, and were known by

defendants to be false or were recklessly disregarded as such thereby, for the following reasons,

among others:

        (a)     Defendants had inflated the Company's results during the Class Period by

manipulating Green Mountain's accounting for revenues and income;

        (b)     Defendants had materially overstated the Company's profitability during

the Class Period by failing to properly account for the Company's results of operation and by

artificially inflating the Company's financial results;

        (c)     The Company did not maintain adequate systems of internal operational or

financial controls during the Class Period, to ensure that Green Mountain's reported financial

statements were true, accurate, or reliable;

14

(d)     The Company's financial statements and reports issued during the Class

Period were not prepared in accordance with GAAP and SEC rules; and

(e)     As a result of these undisclosed conditions, defendants lacked any

reasonable basis to claim that Green Mountain was operating according to plan, or that Green

Mountain could achieve the previously issued guidance.

## THE TRUTH ABOUT THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF GREEN MOUNTAIN EMERGES

32.     On September 28, 2010, after the close of trading, defendants filed a Form 8-K

that revealed, for the first time, that the Company was the subject of an SEC investigation into its

revenue recognition. In the SEC filing, the defendants disclosed that the Company had been

notified by the SEC of this investigation on September 20, 2010 and that the Company was

expected to take a restatement charge in the near term, rendering the Company's prior reported

financial statements and reports unreliable, false, and materially misleading. The Form 8-K

stated, in pertinent part:

> In connection with its acquisition of LJVH Holdings, Inc., or Van Houtte, a leading gourmet coffee brand in Canada in the home and office channels, and the marketing of the associated $1.35 billion debt financing, the Company hereby furnishes the following information:
>
> Intercompany adjustment correction
>
> In connection with the preparation of its financial results for its fourth fiscal quarter, the Company's arrangement discovered an immaterial accounting error relating to the margin percentage it had been using to eliminate the inter-company markup in its K-Cup inventory balance residing at its Keurig business unit. Management discovered that the gross margin percentage used to eliminate the inter-company markup resulted in a lower margin applied to the Keurig ending inventory balance effectively overstating consolidated inventory and understating cost of sales. Management determined that the accounting error arose during fiscal 2007 and analyzed the quantitative impact from that point forward to June 26, 2010.
>
> As of June 26, 2010, there is a cumulative $7.6 million overstatement of pre-tax income. Net of tax, the cumulative error resulted in a $4.4 million overstatement

of net income or a $0.03 cumulative impact on earnings per share.

SEC inquiry

On September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information. Based on the request, the Company believes the focus of the inquiry concerns certain revenue recognition practices and the Company's relationship with one of its fulfillment vendors. The Company, at the direction of the audit committee of the Company's board of directors, is cooperating fully with the SEC staff s inquiry.

33.    Following this announcement, Green Mountain's stock declined $5.95 per share,

or 16%, to close at 31.06 per share on September 29, 2010.

## LOSS CAUSATION/ECONOMIC LOSS

34.    Defendants' fraudulent scheme and misrepresentations and omissions concerning

Green Mountain's financial performance caused the price of the Company's stock to be

artificially inflated during the Class Period. When defendants' prior misrepresentations and

fraudulent conduct were disclosed and became apparent to the market, Green Mountain's

common stock fell precipitously as the prior artificial inflation came out of Green Mountain's

common stock price. As a result of their purchases of Green Mountain's common stock during

the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages,

under the federal securities laws.

35.    Defendants' false and misleading statements had the intended effect and caused

Green Mountain's common stock to trade at artificially inflated levels throughout the Class. As

a direct result of defendants' September 28, 2010 announcement, Green Mountain's common

stock price fell approximately $5.95 per share, or 16%, to close at $31.06 per share on September

29, 2010. The 16% decline in Green Mountain's common stock price at the end of the Class

Period was a direct result of the nature and extent of defendants' fraud finally being revealed to

16

investors and the market. The timing and magnitude of Green Mountain's common stock price declines negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate Green Mountain's common stock price.

## **VIOLATIONS OF GAAP AND SEC REPORTING RULES**

36.    During the Class period, defendants materially misled the investing public by inflating the price of the Company's securities and by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements not false and misleading. Defendants' statements were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and Generally Accepted Accounting Principles ("GAAP").

37.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

38.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

39.     Item 303 of Regulation S-K requires that, for interim periods, the Management

Division and Analysis Section ("MD&A") must include, among other things, a discussion of any

material changes in the registrant's results of operations with respect to the most recent fiscal

year-to-date period for which an income statement is provided.  Instructions to Item 303 require

that this discussion identify any significant elements of a registrant's income or loss from

continuing operations that are not necessarily representative of the registrant's ongoing business.

Item 303(a)(2)(ii) to Regulation S-K requires that a company's publicly filed reports with the

SEC contain the following discussion:

> Describe any known trends or uncertainties that have had or that the registrant
> reasonably expects will have a material favorable or unfavorable impact on net
> sales or revenues or income from continuing operations. If the registrant knows of
> events that will cause a material change in the relationship between costs and
> revenues (such as known future increases in costs of labor or materials or price
> increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states:

> The discussion and analysis shall focus specifically on material events and
> uncertainties known to management that would cause reported financial
> information not to be necessarily indicative of future operating results or of future
> financial condition. This would include descriptions and amounts of (A) matters
> that would have an impact on future operations and have not had an impact in the
> past...

40.     The GAAP requirement for recognition of an adequate provision for foreseeable

costs and an associated allowance applies to interim financial statements as required by

Accounting Principles Board Opinion No. 28. Paragraph 17 states that:

> The amounts of certain costs and expenses are frequently subjected to year-end
> adjustments even though they can be reasonably approximated at interim dates.
> To the extent possible such adjustments should be estimated and the estimated
> costs and expenses assigned to interim periods so that the interim periods bear a
> reasonable portion of the anticipated annual amount.

41.     The Company's financial statement contained in the Form 10-Q filed with the

SEC during the Class Period was presented in a manner that violated the principle of fair

financial reporting and the following GAAP provisions, among others:

(a)     The principle that financial reporting should provide information that is

useful to present and potential investors and creditors and other users in making rational

investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)     The principle that financial reporting should provide information about an

enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it

represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is  left

out of the information that may be necessary to ensure that it validly represents underlying

events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to

uncertainty to try to ensure that uncertainties and risks inherent in business situations are

adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the

fairness of presentation of financial data at an interim date shall be disclosed in interim reports in

the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that management should provide commentary relating to the

effects of significant events upon the interim financial results (APB Opinion No. 28).

42.     During the Class Period defendants also violated SEC disclosure rules by failing

to:

(a)    disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income, or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303); and

(b)    file financial statements with the SEC that conformed to the requirements of GAAP, which as a result, rendered such financial statements presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

43.    Defendants were required to disclose the existence of the material facts and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that the Company's interim financial statement, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading. Defendants' materially false and misleading statements caused the Company's common stock to trade at artificially inflated prices.

## ADDITIONAL EVIDENCE OF SCIENTER

44.    The Individual Defendants were active, culpable and primary participants in the fraudulent scheme to inflate Green Mountain's financial results by virtue of: (1) their receipt of information reflecting the improper and fraudulent accounting described herein and/or their failure to review information they had a duty to monitor; (2) their actual issuance and control over Green Mountain's materially false and misleading statements; and (3) their association with the Company which made them privy to confidential information concerning Green Mountain. The Individual Defendants also knew or recklessly disregarded that their materially false and

misleading statements would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to be artificially inflated.

45.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because, by deceiving the investing public about the intrinsic value of Green Mountain common stock, defendants were able to:  (a) artificially inflate the price of Green Mountain shares; (b) sell $250 million of Company shares to Lavazza, while defendants were in possession of material, adverse, non-public information about the Company; (c) enable Green Mountain insiders to sell millions of dollars of their privately held Green Mountain shares while in possession of material, adverse, non-public information about the Company; and (e) cause plaintiff and other members of the Class to purchase Green Mountain common stock at artificially inflated prices.

46.     In addition, defendants' improprieties enabled Richard Scott McCreary ("McCreary"), President of the Company's SCBU, and Michelle V. Stacy ("Stacy"), President of the Company's Keurig unit, to exercise and sell 240,000 shares of Green Mountain common stock for proceeds of almost $8,000,000.  Specifically, on September 21, 2010, the day after the Company learned of the SEC's inquiry, Stacy exercised 5,000 options and sold her shares at $37 per share. Of the 5,000 shares bought and sold, options for 4,375 shares did not expire until November 3, 2018 and options for 625 shares did not expire until March 12, 2019. The following chart depicts the sales made by insiders during the Class Period:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Richard S. McCreary | 8/18/2010 | 200,000 | $33.076 | $6,615,200 |
| | | | | |
| Stacy Michelle | 8/13/2010 | 30,000 | $30.954 | $928,620 |
| | 9/13/2010 | 5,000 | $35.40 | $177,000 |
| | 9/21/2010 | 4,375 | $37.00 | $161,875 |

| | 9/21/2010 | 625 | $37.00 | $23,125 |
|---|---|---|---|---|
| | | 40,000 | | $1,290,620 |
| | | | | |
| | **Total:** | **240,000** | | **7,905,820** |

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

47.    At all relevant times, the market for Green Mountain's common stock was an efficient market for the following reasons, among others:

(a)    Green Mountain's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Green Mountain filed periodic public reports with the SEC and the Nasdaq;

(c)    Green Mountain regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and,

(d)    Green Mountain was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports entered the public marketplace.

48.    As a result of the foregoing, the market for Green Mountain securities promptly digested current information regarding Green Mountain from all publicly available sources and reflected such information in Green Mountain's stock price. Under these circumstances, all purchasers of Green Mountain common stock during the Class Period suffered similar injury

through their purchase of Green Mountain common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Green Mountain who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the investing public regarding Green Mountain's business, operations, management and the intrinsic value of Green Mountain

common stock; (b) enable defendants to artificially inflate the price of Green shares; (c) enable

Green Mountain to sell $250 million of Company shares to Lavazza while defendants were in

possession of material, adverse, non-public information about the Company; (d) enable Green

Mountain insiders to sell millions of dollars of their privately held Green Mountain shares while

in possession of material, adverse, non-public information about the Company; and (e) cause

plaintiff and other members of the Class to purchase Green Mountain common stock at

artificially inflated prices.

52.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business that

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

to maintain artificially high market prices for Green Mountain's common stock in violation of

Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as

alleged below.

53.     Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business,

operations and future prospects of Green Mountain.

54.     These defendants employed devices, schemes, and artifices to defraud, while in

possession of material, adverse, non-public information.

55.     Defendants engaged in acts, practices, and a course of conduct in an effort to

assure investors of Green Mountain's value, performance, and continued substantial growth. This

included the making of, or the participation in the making of, untrue statements of material facts

and omitting to state material facts necessary in order to make the statements made about Green Mountain and its business operations and future prospects in the light of the circumstances under which they were made, not misleading.

56.     Defendants engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Green Mountain common stock during the Class Period.

57.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his/her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

58.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Green Mountain's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants'

overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the market price of Green Mountain common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Green Mountain's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Green Mountain common stock during the Class Period at artificially high prices and were damaged thereby.

60.     At the time of defendants' misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Green Mountain was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Green Mountain common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at artificially inflated prices.

61.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**

**Violation Of Section 20(a) Of
The Exchange Act Against Individual Defendants**

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of Green Mountain within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

27

66.     Green Mountain and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 1, 2010

**Axelrod & Adler PLLC**

Steven A. Adler
1194 Main Street
St. Johnsbury, VT 05819
Telephone: (802)748-8161

Daniel E. Bacine
Jeffrey B. Gittleman
Beth T. Seltzer
**Barrack, Rodos & Bacine**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Attorneys for Plaintiff*